UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO: 12-CR-12 (JDB)** |
| | : | |
| v. | : | |
| | : | |
| **SIMON A. DILLON,** | : | |
| Defendant. | : | |
| | : | |

---

## MEMORANDUM OPINION

The government has moved for the involuntary medication of defendant Simon Dillon, who suffers from mental illness, to render him competent to stand trial. Pursuant to Sell v. United States, 539 U.S. 166, 180 (2003), the Court must consider whether involuntary medication is medically appropriate and necessary to significantly further an important government interest. Upon consideration of the pleadings, the record, and the arguments and evidence presented at the April 17 and 26, 2013 Sell hearing, the Court determines that the government has demonstrated by clear and convincing evidence[1] that the Sell standards have been met and that involuntary medication is appropriate and necessary. The government's motion to involuntarily medicate defendant is therefore granted.

## BACKGROUND

On or about December 10, 2011, defendant allegedly threatened the President of the United States with bodily harm by sending an email to a United States Secret Service ("USSS") agent stating that, if the President refuses to meet with him, he "will get the worse Christmas

---

[1] The D.C. Circuit has not yet addressed the standard of proof to be applied in a Sell determination; however, other circuits and at least one district judge on this Court have used the clear and convincing standard. See United States v. Austin, 606 F. Supp. 2d 149, 151 n.3 (D.D.C. 2009) (applying the clear and convincing standard and noting its use by the Second and Tenth Circuits); United States v. Bush, 585 F.3d 806, 814 (4th Cir. 2009); United States v. Green, 532 F.3d 538, 545 n. 6 (6th Cir. 2008).

present ever," "will suffer for 30 days," and "will wish for death, but death will not come to him." Indict. at 1-2 [ECF No. 3]. Defendant was indicted for violating 18 U.S.C. § 871. A warrant was issued with the return of the indictment, and the USSS arrested defendant on that warrant on January 17, 2012. Gov't's Mem. Supp. Invol. Medication at 2 [ECF No. 32].

On January 20, 2012, the Court ordered defendant committed to the custody of the Attorney General for a competency evaluation. Defendant was evaluated at the Metropolitan Correctional Center, and William J. Ryan, Ph.D and Elissa R. Miller, Ph.D authored the competency report diagnosing him with Schizophrenia, Paranoid Type. See Competency Report at 15 (March 14, 2012). Drs. Ryan and Miller found that although defendant has a mental illness that compromises his insight and his recognition that he is mentally ill, he nonetheless has a rational and factual understanding of the proceedings against him and is capable of assisting counsel with his defense. Id. at 14. However, the conclusion that defendant was competent to stand trial was made "with less than the usual degree of psychological certainty" because defendant was "unable to rationally consider an Insanity Defense to which he may be entitled." Id. at 14-15.

The Court subsequently found defendant competent to stand trial. However, both defendant and the government later orally moved for further psychiatric evaluation. The Court granted the motions and ordered defendant committed to the custody of the Attorney General for further evaluation at Butner Federal Medical Center ("Butner"). Once at Butner, defendant was diagnosed with Delusional Disorder, Grandiose Type in a forensic report authored by Heather H. Ross, Ph.D. See Forensic Report at 16 (Aug. 24, 2012). Dr. Ross found that, although defendant is able to understand the nature and consequences of the proceedings against him, he suffers from a severe mental disease or defect that prevents him from assisting properly in his defense.

Id. at 19. Dr. Ross concluded that defendant was not competent to proceed, and recommended that he be committed for mental health treatment. Id.

A competency hearing was subsequently held, and the Court found defendant incompetent and ordered him committed to the custody of the Attorney General for a Competency Restoration Study. Jill R. Grant, Psy. D. and Jill C. Volin, M.D. authored the Study and diagnosed defendant with Schizoaffective Disorder, Bipolar Type.[2] See Gov't's Ex. 2, Competency Restoration Study at 19 (Feb. 14, 2013) (hereinafter "Competency Restoration Study"). The Study concluded that defendant is incompetent to stand trial as he "is unable to understand the significance of his charges or the criminal process in a rational manner due to his psychotic illness," and "would be unable to assist in his defense due to his ingrained delusional beliefs." Id. at 21. Drs. Grant and Volin also found that defendant's prior medical record indicates that defendant responded favorably to psychotropic medication in the past, and that there was a substantial probability that he could be restored to competency with the administration of antipsychotics. Id. at 20, 31. As a result, Drs. Grant and Volin requested a judicial order for the involuntary treatment of defendant with antipsychotic medication to restore him to competency. Id. at 21.

On February 20, 2013, the government orally moved to have defendant involuntarily medicated. Defendant opposed the motion, and a Sell hearing was held on April 17 and 26, 2013. At the hearing, the government provided testimony from forensic psychologist Dr. Jill Grant and psychiatrist Dr. Jill Volin via videoconference from Butner. Drs. Grant and Volin had previously evaluated defendant for the February 14, 2013 Competency Restoration Study.

---

[2] Although the February 2013 diagnosis is different from both the March 2012 and August 2012 diagnoses, all three diagnoses are of psychotic illnesses and are treated with similar medication. 4/17/13 Hr'g Tr. at 50:14-16 (Dr. Jill Grant testified that "[t]he [three diagnoses are] all very different disorders, but they're all psychotic in nature, and they're all treated similarly").

Dr. Grant, whom the court qualified as an expert witness in the area of clinical forensic psychology, testified that, in her opinion and to a medical degree of certainty, defendant suffers from Schizoaffective Disorder, Bipolar Type.  4/17/13 Hr'g Tr. at 10:15-17, 17:2-3.  In particular, Dr. Grant testified that defendant has bizarre delusions, hallucinations, and mood problems that vary from mania to depression.  Id. at 17:8-14, 21:11-16, 24:16-19.  She further testified that defendant lacks insight into his illness and that his psychotic disorder "directly interferes with his ability to help prepare his defense and understand what is going on in the courtroom."  Id. at 15:5-8, 23:10-11.

Dr. Volin, whom the court qualified as an expert witness in the area of forensic psychiatry, also testified that, in her opinion and to a medical degree of certainty, defendant suffers from Schizoaffective Disorder, Bipolar Type.  Id. at 65:17-19, 66:25-67:1.  Dr. Volin testified that defendant lacks insight into his mental illness, and that treatment of defendant's mental illness with antipsychotics is medically appropriate and substantially likely to restore him to competence.  Id. at 68:15-18, 73:6-11, 76:5-6.  She also testified that defendant's lack of negative symptoms of psychosis[3] and his previous positive response to antipsychotic medicine[4] are important factors that support the likelihood that antipsychotics can restore his competency. Id. at 82:1- 83:2.  Dr. Volin noted that defendant previously experienced hallucinations and sadness after taking an antipsychotic,[5] and stated that these effects were symptoms of defendant's mental illness, not side effects of the medication.  Id. at 86:23-88:2.  Dr. Volin

---

[3] Negative symptoms of psychosis include impoverished speech, flat affect, and reclusiveness.  See 4/17/13 Hr'g Tr. at 82:6-11.  Dr. Volin testified that such symptoms are difficult to treat.  Id. at 82:12-15.

[4] Defendant's positive response to antipsychotic medication was documented in defendant's June-August 2010 medical record from Wing Memorial Hospital.  See Gov't's Exs. 6, 7.

[5] Defendant's August 2010 medical record from Wing Memorial Hospital recorded that defendant experienced command hallucinations to kill himself and that he was prescribed with medication to "help his sadness."  See Gov't's Ex. 7 at 4.

further testified that antipsychotic medication is substantially unlikely to result in side effects that will interfere significantly with defendant's ability to assist his counsel in his defense. Id. at 88:3-11. In particular, Dr. Volin stated that most of the likely side effects would have no effect on cognition and could be monitored and treated with other medication if necessary, and that such treatment would not be expected to have an adverse effect on defendant's competency. Id. at 88:19-20, 89:2-3, 91:2-16.

Also at the Sell hearing, defendant testified concerning his competency[6] and his past experience with antipsychotic medication. In particular, defendant testified that he believes antipsychotic medication caused him to suffer severe depression and numbness in his extremities. Id. at 129:6-14, 130:1-7. He also stated that he is not delusional and that he does not need any treatment. Id. at 134:13-21. However, defendant then testified that he was "the King of Gia," was reincarnated as "Simon Peter" about 2,000 years ago, and that he would prove he was the "Star of Seven" at trial. Id. at 135:2-16.

## DISCUSSION

Although an individual has a constitutionally protected interest in avoiding involuntary medication, that interest can be overcome by an "essential" or "overriding" state interest in some

---

[6] Although competency is an issue to be determined *prior* to a Sell hearing and the Court already found defendant incompetent, defendant raised the issue of competency once again at the Sell hearing. The government submits that the burden to prove competency now rests with the defendant and that the testimony of defendant at the Sell hearing alone is insufficient to meet that burden. The Court agrees. "Competence to stand trial requires 'sufficient present ability to consult with [one's] lawyer with a reasonable degree of rational understanding and . . . a rational as well as factual understanding of the proceedings against [oneself].'" United States v. Caldwell, 543 F.2d 1333, 1348 (D.C. Cir 1975) (citing Dusky v. United States, 363 U.S. 402, 402 (1960)). Here, there are two psychological evaluations and testimony from two expert witnesses concluding that defendant's mental illness renders him incompetent under this standard. Although defendant testified that he is not afflicted with mental problems, the record confirms that defendant lacks insight into his mental illness, tries to downplay his psychological problems, and is not an accurate historian of his mental illness. See Competency Restoration Study at 17-18, 21; 4/17/13 Hr'g Tr. at 16:3-7, 23:10-11 39:16-17, 51:6-13. Accordingly, defendant's testimony regarding his psychological state cannot be viewed as credible, and is therefore inadequate to call into question the Court's prior determination of incompetence.

circumstances.  Sell, 539 U.S. at 179-80.  In particular, a court may order the administration of medication to render a mentally ill defendant competent to stand trial on criminal charges if:

> (1) doing so advances an important government interest, such as bringing to trial an individual accused of a serious crime;
>
> (2) the medication is substantially likely to render defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with defendant's ability to assist counsel in conducting a trial defense;
>
> (3) alternative less intrusive treatments are unlikely to achieve substantially the same result; and
>
> (4) administration of the medication is medically appropriate, i.e., in the patient's best interest in light of his medical condition.

Id. at 180-82.

**1.  Important Government Interest**

To meet the first Sell factor, the government must establish that involuntary medication will advance an important government interest, such as bringing to trial an individual accused of a serious crime.  Id. at 180.  To determine if an important government interest is at stake, the Court must consider whether the defendant is charged with a serious crime and whether any special circumstances, such as the defendant already having been confined for a significant period of time, undermine the importance of the government's interest in prosecution.[7]  Sell, 539 U.S. at 180.

Here, the government has an important interest in bringing to trial an individual accused of the serious crime of threatening the President with bodily harm.  The defense concedes as much, but argues that this interest is undercut by the significant period of confinement that defendant faces, whether or not he is found guilty at trial.  In particular, defendant has already

---

[7] The Sell opinion also mentioned that a likelihood of civil commitment could potentially diminish the government's interest in prosecution.  See Sell, 539 U.S. at 180.  However, defendant did not make such an argument here, and therefore the Court finds it unnecessary to analyze that issue.

been in federal custody for approximately fourteen months, to be followed by as much as an additional six months if there is an appeal, and four more months if involuntary medication is ordered. Defendant argues that he therefore "may well have served whatever prison sentence he would be exposed to by the time his competency is expected to be restored." Def.'s Opp. at 5.

The government responds that defendant's fourteen months of pre-trial custody, even in conjunction with any additional time to resolve the competency proceedings and complete trial, is significantly less than the 51-to-60-month Guidelines range of incarceration that defendant faces if convicted, and is not extensive enough to undermine the government's important interest in bringing defendant to trial.

The court agrees that the defendant's pre-trial custody is not so lengthy as to undermine the government's interest. In relevant cases, courts have considered similar or longer pre-trial custody periods to be acceptable. For example, in United States v. Aleksov, where defendant was charged with threatening the President and faced an estimated 10-to-33-month sentencing range, his pre-trial custody of approximately sixteen months did not undermine the government's interest in prosecuting him. United States v. Aleksov, 2009 WL 1259080, at *1-2 (D.D.C. May 7, 2009); see also United States v. Bush, 585 F.3d 806, 815 (4th Cir. 2009) (although denying involuntary medication on other grounds, finding that pre-trial custody for over two years did not undermine the government's interest, even where the time already served was sufficiently long to account, or nearly account, for any sentence that reasonably could be anticipated). Furthermore, the Aleksov court concluded that, not only was there an important government interest in bringing the defendant to trial that would be advanced by involuntary medication, but a restoration of competency would also allow for a prompt resolution of the matter, which is ultimately in the defendant's own interest. See Aleksov, 2009 WL 1259080, at *2; see also

United States v. Orloski, 554 F. Supp. 2d 4, 8 (D.D.C. 2004) (finding that pre-trial custody of approximately twelve months did not undermine government's interest, and that involuntary medication was necessary for a prompt resolution of the matter and was ultimately in the interest of both parties).

In contrast, cases where the court has held that the government's significant interest in prosecuting a defendant was diminished involved much longer periods of pre-trial custody than defendant anticipates here. See United States v. Austin, 606 F. Supp. 2d 149, 152 (pre-trial custody of twenty-seven months diminished government interest); United States v. White, 620 F.3d 401, 419 (4th Cir. 2010) (pre-trial custody of forty-one months, in conjunction with the less serious nature of defendant's alleged crime,[8] undermined government's interest).

Here, there is no dispute that threatening the President is a "serious crime," and that the government has an important interest in bringing defendant to trial. In addition, case law supports the conclusion that defendant's pre-trial custody is not so lengthy as to undermine the government's interest. Hence, the first element of the Sell analysis is established.

**2. Involuntary Medication Will Significantly Further that Government Interest**

To demonstrate that involuntary medication will significantly further the government's interest, the government must establish that involuntary medication is both substantially likely to restore defendant to competency, and substantially unlikely to have side effects that will interfere

---

[8] The court in White noted that "[n]ot every crime is equally serious" – in particular, it determined that non-violent fraud, although serious, is not as serious as the alleged crimes in Bush, 585 F.3d 806, 810 (4th Cir. 2009) (involving threats against a federal judge), and United States v. Evans, 404 F.3d 227, 232 (4th Cir. 2005) (involving assault of a government employee and threats against a federal judge). See White, 620 F.3d at 419. The court further found that in Evans and Bush "there was a compelling safety concern inherent in the prosecution since it could help safeguard the defendant's alleged victims." Id. Similar to Evans and Bush, and in contrast to White, the instant case presents allegations of a serious crime that is violent in nature, and the prosecution of the crime could help safeguard the alleged victim.

significantly with defendant's ability to assist counsel in conducting a trial defense. Sell, 539 U.S. at 181. The government has satisfied this Sell requirement here.

The Competency Restoration Study concludes that the involuntary administration of antipsychotic medication will be substantially likely – at least 81.8% – to render defendant competent to stand trial. Competency Restoration Study at 23-24, 31 (estimating "the likelihood of Mr. Dillon manifesting a positive treatment response would be at least as high as the cohort described in the 2012 article[9] [] by Cochrane and colleagues in which 18 of 22 defendants (81.8%) [diagnosed with a combination psychotic and mood disorder like Mr. Dillon] were restored to competency status [after involuntary medication]"). Furthermore, the Competency Restoration Study found that defendant will be responsive to antipsychotic medication because: he is "free from negative symptoms of psychosis, which in some studies have been associated with a less robust response to medication treatment"; "his psychotic symptoms have responded favorably to medication in the past"; and the majority of individuals with his disorder "manifest some degree of clinical improvement following treatment with antipsychotic medication." Id. at 31. Dr. Volin's testimony at the Sell hearing reiterated this information, and expounded that "[i]n a population like Mr. Dillon's, we expect these medications to be 80 to 90 percent effective, which is an incredibly high effectiveness rate." Id. at 94:13-15.

In the past, courts have found that involuntary medication is substantially likely to restore competency when the predicted efficacy was only about 70%. See U.S. v. Aleksov, 2009 WL 1259080, at *3 (D.D.C. 2009); see also United States v. Weston, 255 F.3d 873, 883 (D.C. Cir. 2001) (court applied the analysis of Washington v. Harper, 494 U.S. 210 (1990), and Riggins v. Nevada, 504 U.S. 127 (1992), rather than Sell because the defendant was considered to be

---

[9] Gov't's Ex. 4, Robert E. Cochrane, et al., The *Sell* Effect: Involuntary Medication Treatment Is a "Clear and Convincing" Success, Law & Hum. Behav. (2012).

dangerous to himself and others in an institutional setting; nonetheless, the Harper/Riggins analysis requires a determination similar to Sell that involuntary medication is likely to restore competency).

Defendant argues that it is unlikely he can be restored to competency with involuntary medication, and advocates for an outcome similar to that in United States v. Austin, where the court determined that involuntary medication was unlikely to further the important government interest at stake because the restoration of his competency was unlikely. See United States v. Austin, 606 F. Supp. 2d 149 (D.D.C. 2009). But Austin is distinguishable. The government in Austin did not establish that involuntary medication would be substantially likely to restore defendant to competence because its chief expert witness testified that he did not review all of the defendant's medical records and could not testify with certainty that medication was responsible for the defendant's earlier restoration of competency. Id. at 152. Moreover, and of particular importance in distinguishing Austin from this case, the defendant in Austin committed the charged crime while involuntarily medicated and while participating in a competency restoration program. Id. at 152-53.

Defendant further argues that there is evidence that antipsychotics are not effective in treating a person suffering from Delusional Disorder.[10] However, his only support is a Fourth Circuit case in which the court concluded there was not enough evidence to warrant involuntarily medicating a female defendant suffering from Delusional Disorder, Grandiose Type when the expert witness had never treated anyone with the defendant's disorder, was unsure how antipsychotic medication would affect the defendant, and relied on a scientific study that only

---

[10] The Competency Restoration Study does not diagnose defendant with Delusional Disorder. Defendant's most recent diagnosis is Schizoaffective Disorder, Bipolar Type. See Competency Restoration Study at 19. Defendant was diagnosed with Delusional Disorder at one time however, see Forensic Report at 16 (Aug. 24, 2012), and his current diagnosis involves delusional thinking, see 4/17/13 Hr'g Tr. at 24:16-19.

included male participants who were mostly diagnosed with a different type of delusional disorder.  See United States v. White, 620 F.3d 401, 420-21 (4th Cir. 2010).

Here, in contrast, the Competency Restoration Study, supported by expert witness testimony, details the presiding psychologist's and psychiatrist's knowledge of and experience using antipsychotics to treat individuals with defendant's disorder, and specifically opines that defendant would respond positively to antipsychotic medication.  Furthermore, the Competency Restoration Study references a scientific study of similarly afflicted defendants who were involuntarily medicated with very successful results.  See Competency Restoration Study at 23-24, 31; Gov't's Ex. 4.  Therefore, the record supports the conclusion that medicating defendant is substantially likely to restore him to competency.

With respect to side effects, defendant testified that he experienced depression in a previous experience taking an antipsychotic medication.[11]  4/17/13 Hr'g Tr. at 129:6-14, 130:1-7.  However, Dr. Volin testified that any sadness or depression that defendant experienced was a symptom of his mental illness, not a side effect of antipsychotic medication.  Id. at 86:23-87:3, 87:22-25, 88:1-2.  Furthermore, depression can be treated with mood stabilizing medication.  See Gov't's Ex. 4 at 5.  In regard to other potential side effects, Dr. Volin testified that antipsychotic medication "will actually, in most cases, improve cognition," and that any side effects can be mitigated by prevention, changing medication, decreasing the dose of medication, or adding medication.[12]  Id. at 88:8-11, 91:2-16.  She further testified that defendant would be monitored

---

[11] Defendant also complained that he experienced numbness in his extremities after taking an antipsychotic, but such a side effect was not argued to have impaired defendant's cognition, and is a side effect that the doctors can monitor and treat.  See 4/17/13 Hr'g Tr. 90:18-25, 91:1-16 (Dr. Grant testified that extrapyramidal symptoms, or "Parkinsonian-like" symptoms, can be treated with medication, and such intervention would not have an adverse effect on defendant's competency).

[12] Dr. Volin testified about several potential side effects in particular.  She indicated that one potential side effect is sedation, which can be mitigated by administering medication in the evening.  4/17/13 Hr'g Tr. at 88:20-25, 89:1-3.

twenty-four hours a day for all potential side effects. Id. at 91:2-16, 93:23-25. The Competency Restoration Study reinforces Dr. Volin's oral testimony, and concludes that the side effects associated with antipsychotic medications are easily and effectively treated by medication changes and routine medical intervention. See Competency Restoration Study, 25-27. The record therefore supports the conclusion that involuntary medication is substantially unlikely to result in side effects that will interfere significantly with defendant's ability to assist counsel in conducting his trial defense. See U.S. v. Aleksov, 2009 WL 1259080, at*3 (D.D.C. 2009) (court found that involuntary medication was substantially unlikely to have side effects that would interfere with defendant's ability to assist counsel when both expert witnesses testified and concluded in their report that potential side effects could be monitored closely and mitigated upon the first showing of symptoms).

The Court therefore finds that the government has established that involuntary medication will significantly further the government's interest in prosecuting defendant by demonstrating that medicating defendant is substantially likely to restore his competency and is substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel in his defense. The second Sell factor has thus been met.

### 3. Involuntary Medication is Necessary to Further that Government Interest

To satisfy the third prong of Sell, the government must establish that alternative, less-intrusive treatments are unlikely to achieve substantially the same results as involuntary medication, thereby making involuntary medication necessary to further the government's interest in proceeding to trial. See Sell, 539 U.S. at 181.

---

Dr. Volin further testified that there is a .07 – 2% chance that a dangerous side effect – known as neuroleptic malignant syndrome – could occur, but that defendant would be monitored for any symptoms of such a side effect. Id. at 93:4-21. Dr. Volin also testified that there are other side effects that have delayed onset and would be unlikely to develop during the four-month treatment plan proposed, but can be treated and would be unlikely to have an adverse effect on defendant's competency. Id. at 89:4-25, 90:1-8.

At the Sell hearing, Dr. Volin testified that antipsychotics were medically necessary to treat defendant's mental illness and that psychotherapy would not be "near[ly] as effective as antipsychotic medication to treat psychotic illness." 4/17/13 Hr'g Tr. at 73:6-11, 74:13-25. The Competency Restoration Study also states that other types of treatment for defendant's disorder, such as cognitive-behavioral therapy, are unavailable "because of [defendant's] inability to focus on relevant issues, his lack of acknowledgment [that] he suffers from a mental disorder, and his refusal to engage in ongoing discussions about treatment recommendations." Competency Restoration Study at 32-33.

The Study further noted that a court order backed by threat of citation for contempt would not be a viable alternative: "[T]here is no compelling evidence that an incompetent defendant should reasonably be expected to have the mental capacity to understand the implications of a contempt order as a basis for making a rational decision on whether to comply with it." Id. at 31-32; see also 4/17/13 Hr'g Tr. at 75:1-14 (Dr. Jill Volin testified that court orders commanding patients to take their medication do not work). The Study concludes that "involuntary medication is necessary because alternative, less intrusive treatments are unlikely to achieve substantially the same results of restoring [defendant] to competency." Id. at 33.

Defendant did not address the possibility of implementing less intrusive treatments in his Opposition or at the Sell hearing. The Court thus finds that the government's uncontested evidence establishes the necessity of involuntary medication to further the government's interest in bringing defendant to trial.

### 4. Administration of the Medication is Medically Appropriate

The final Sell factor requires the government to establish that administering the medication in question is medically appropriate. See Sell, 539 U.S. at 181. Medication is

13

medically appropriate when it is the common and standard course of treatment for defendant's condition. See Aleksov, 2009 WL 1259080 at *3; Orloski, 554 F. Supp. 2d at 7.

Here, the Competency Restoration Study states that "[t]reatment with antipsychotic medication is the accepted and appropriate first-line treatment for an individual with schizoaffective disorder."[13] Competency Restoration Study at 33. Moreover, defendant is medically stable and does not have any acute medical issues that would present a contraindication to an antipsychotic medication treatment plan. Id. at 34. The Study's conclusions on this point are supported by Dr. Volin's testimony at the Sell hearing. See 4/17/13 Hr'g Tr. at 73:6-17.

At oral argument, the defense argued that defendant's mental illness does not need to be treated at all because, although defendant clearly has delusional thoughts of being a prophet or a god, he does not pose any real danger. However, the "dangerousness" of defendant's mental illness is not the issue at hand; the issue is the appropriateness of the chosen treatment – here, antipsychotics – for defendant's diagnosed illness. And the record amply supports that antipsychotics are "the common and standard course of treatment for defendant's condition." See Aleksov, 2009 WL 1259080 at *3; Orloski, 554 F. Supp. 2d at 7.[14]

---

[13] At first glance, it is potentially troubling that defendant has been diagnosed with three different mental illnesses (Schizophrenia, Paranoid Type; Delusional Disorder, Grandiose Type; and Schizoaffective Disorder, Bipolar Type) in less than a year. However, the expert witness testimony clarified that all three diagnoses are psychotic illnesses, for which the preferred treatment is the same – administration of antipsychotic medication. See 4/17/13 Hr'g Tr. at 50:14-16. Furthermore, Dr. Grant and Dr. Volin noted that defendant was in their facility under observation for a longer period of time than he was for the other diagnoses, and therefore they had the opportunity to evaluate him in more depth, 4/17/13 Hr'g Tr. at 35:15-19, 48:20-23; they also had access to both of the previous evaluations, in addition to defendant's medical records, family information and feedback about defendant, and information about Butner staff interactions with defendant, id. at 102:9-12. Considering that Drs. Grant and Volin had more information available to them than previous diagnosing doctors, the Court will credit their diagnosis over the others.

[14] Defendant has provided no support for his contention that "First Generation" antipsychotic medication should not be used, see Opp'n at 7 n.4, and the Court will defer to the medical staff at Butner to determine the appropriate regimen of antipsychotic medication to use in the treatment of defendant.

Hence, the Court finds that the government has properly demonstrated the appropriateness of medicating defendant with antipsychotics.  Thus, this element under <u>Sell</u> is also met.

## CONCLUSION

In sum, the Court concludes that the government has demonstrated by clear and convincing evidence that the four <u>Sell</u> factors have been satisfied in this case.  Pursuant to <u>Sell</u>, then, involuntary medication is appropriate and necessary to significantly further an important government interest.  The Court therefore grants the government's motion to involuntarily medicate defendant.  An Order consistent with this Memorandum Opinion will be issued separately.

/s/
JOHN D. BATES
United States District Judge

Dated: <u>May 3, 2013</u>